UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 25-cr-10465-MJJ |
| | ) | |
| TYLER BULLOCK | ) | |
| | ) | |

Tyler Bullock's Sentencing Memorandum

Tyler Bullock entered his plea before this court to a charge of possession of child pornography, for which he faces a mandatory minimum 10-year sentence as a result of having a prior state conviction for the same offense which resulted in his completion of a probationary sentence. When police searched his home seeking evidence of that offense, they discovered a firearm, which he was prohibited from possessing due to a felony conviction. Mr. Bullock takes responsibility for both offenses, and the parties have negotiated a C-plea with a recommended sentence of 120 months followed by 60 months of supervised release with conditions to promote rehabilitation.

The investigation in this case focused on accounts of a network of individuals in India using PayPal to receive money in exchange for sending CSAM images. Law enforcement found that between October 2024 and March of 2025, Mr. Bullock's PayPal account sent money to these accounts selling CSAM, leading to an investigation into Mr. Bullock. On November 6, 2025, agents arrived at Mr. Bullock's residence early in the morning with a search warrant. Mr. Bullock gave law enforcement his access codes to his phone and iPad. He waived his Miranda rights and agreed to talk to agents, ultimately admitting to the conduct.

Mr. Bullock submits the mandatory minimum sentence is the closest approximation to what is "sufficient but not greater than necessary" to achieve the 18 U.S.C. §3553(a) purposes of sentencing, especially given the particular circumstances of this case including his personal history and characteristics. A sentence of 120 months incarceration is a significant and sufficient sentence for this conduct. No greater

period of incarceration is necessary to accomplish the sentencing goals outlined in 18 U.S.C. 3553(a).

The Court should accept the agreement of the parties and impose as the sentence in this case the joint recommendation:

- Mandatory minimum 120 months incarceration
- 60 months supervised release
- Special assessment of $200.00
- Restitution in an amount to be determined by sentencing.

The Court should further find the JVTA and AVAA assessments inapplicable, as Mr. Bullock is indigent. Mr. Bullock additionally asks this Court for a judicial recommendation that he serve the custodial sentence at FMC Devens so that he can participate in the facility's residential Sex Offender Treatment Program (SOTP-R). SOTP-R is a voluntary, intensive, residential therapeutic program for higher risk male sex offenders serving time in the Bureau of Prisons. This residential treatment program, one of ten in the BOP, employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders. Mr. Bullock is eager and motivated to engage in treatment to address these issues underlying his offense and to fully rehabilitate.

## I. <u>History and Characteristics of Tyler Bullock</u>

Tyler Bullock spent his early childhood raised in a quiet and sheltered home with his sister and both parents. There was no physical violence or abuse in the home, although his father had a problem with alcohol that got worse over time. By all outside appearances, Tyler experienced a relatively normal childhood, going to school and seeing friends in the neighborhood. While his family upbringing was conventional, privately, Tyler endured significant trauma when he was just 7 years-old. Too ashamed to seek help, he instead internalized what happened to him and tried to forget and bury his experience. *See,* PSR ¶ 55.

Growing up, Tyler was especially close with his mother, who worked long and odd hours as a cleaner at the apartment complex where they lived. PSR ¶ 54. His father worked in sales, and the family's income fluctuated. Most nights, Tyler's father drank and could be volatile around his wife and children.

Tyler learned as a child to stay in the background when his father was drinking: while he was not physically violent, the yelling frightened Tyler. Compounding this family trauma and Tyler's personal trauma, when Tyler was in 4th grade, his father's drinking led to his third DUI. That conviction resulted in a jail sentence and halfway house placement away from the family for a year. With his father out of the house, Tyler's mother shouldered the full burden of financial responsibilities. The family struggled. Tyler developed significant anxiety about what would happen to his family, and felt near constant worry. When Tyler was around 11 years old, his father moved back home, and made a serious effort to quit drinking. Tyler recalls this period as the most stable and peaceful in his childhood, with his father sober, his mother working, and himself going to school. Unfortunately, the stability proved fragile.

When Tyler entered his teenaged years, his father lost his job, and his alcohol use returned at its peak levels from before. Tyler witnessed more arguing and stress between his parents. Eventually, their relationship fell apart and they separated. Tyler's father moved out. For Tyler, this marked a turning point from relative stability into chaos and lack of serious oversight for Tyler. After that, it was just Tyler, his sister, and their mother. His mother had to work three different jobs. Tyler stopped going to school and began to smoke marijuana with his friends. Before long, Tyler's father stopped providing any financial support, and his mother began receiving public assistance. Within a year and a half, Tyler no longer had any relationship with his father. PSR ¶ 56. He only learned much later that his father's substance abuse continued to escalate, leading to a heroin overdose years later.

There is no doubt that the loss of his father in the family home following a relatively stable period after his father's return from incarceration played a role in Mr. Bullock's formative adolescent years. It was also during this time that Mr. Bullock left the public school system to be home schooled by his mother. He finished 8th grade at Salem Academy Charter school but simply did not return for 9th grade. While his mother tried her best to home school Tyler, the three jobs she was working made it unrealistic to expect the home schooling would be successful. Tyler found ways to avoid doing his schoolwork. He was not exposed to the same structure as his peers and often retreated inward to an easier world of video games and online play. He began to experience anxiety and depression and a lack of friendship. See, PSR ¶ 65, 67.

When Tyler turned 17, his mother confronted him about his video game use and to talk about what dim prospects his future held if he continued.. He remembers this conversation as a shift in his thinking and realized not having a high school diploma would create real hurdles for certain jobs in the future. He wanted to have a stable future, help his mother, and eventually be independent. Tyler entered a 5-month program at North Shore Community college for people seeking their GED. Surprisingly, Tyler thrived in the structure and community of this program. Tyler was much younger than the other students, who were mainly over 40 years old. He describes the atmosphere there as welcoming and supportive, and he earned his GED. Id. After completing his GED, he took over his mother's job doing cleaning at the apartment complex where they lived. Around the same time, his mother remarried, and the family was able to move away from the apartment complex and into a house for the first time.

Now in his early 20's, Tyler focused on trying to figure out a future path. He was determined to help his family, and took on a new job working at Dominos. He worked around fifty hours a week, saving of his earnings as much as he could. He began as a delivery driver, then a shift leader, and eventually worked his way up to training to become assistant manager, staying with the store for over three years. From there, he hoped to find a better paying job and enrolled in a trade school program for automotive work. After a year-long program, he earned his ASE (Automotive Service Excellence) certification, which meant he could work at a dealership or small autobody shop. Tyler worked at an Audi dealership for approximately two years before deciding to try something new. He saw an opportunity at UPS which for the holiday season being satisfied enough with the job that it led to permanent full-time work. In total, he worked at UPS for over eight years before leaving due to his impending imprisonment. PSR ¶ 68-71.

In his private life, Tyler had a simple schedule. He is a self-described introvert. He worked long hours, and returned to the family house where his mother, stepfather, and sister lived. Tyler helped out around the house and took pride in this modest but meaningful contribution. Eventually he took over the mortgage payments and then officially bought the home from his parents. Upon reflection, Tyler believes living alone at that time and not being as engaged with his family and supports led him into feelings of

isolation and down a path to the criminal conduct. He looks ahead to reengaging in counseling and to lean on his family, as these criminal charges are out in the open.

Today, Tyler feels profound regret. His reflects upon his decision making that was impulsive and he recognizes he simply did not think through any of the consequences or how this behavior affected the victims in these images. Plainly, the consequences are now life-alteringly certain and severe. Yet, he still looks ahead to a future where he will return to the community, to his mother, and to live a simple life. Tyler attended sex offender treatment and general therapy after his prior conviction, and began to unpack some of his childhood in that setting. He believes his returning to treatment with more maturity will be helpful to understanding and processing why he was drawn to this behavior, and especially after his prior conviction. He remains optimistic that he will be able to begin some of this treatment in the prison setting, and then to continue this process when he is back in the community.

## II. <u>Nature of the Offense</u>

The facts of this case are straightforward and fairly described in the Presentence Report at 11-15. On November 6, 2025, law enforcement confronted Mr. Bullock at his home. He provided the access codes to his iPhone and iPad. He answered their questions. Initially, agents only located AI-generated images that were sexually explicit in nature. During the home search, officers located a firearm, which Mr. Bullock is not allowed to legally possess, due to a prior felony conviction. PSR ¶ 46. A full search of the devices seized revealed approximately 300 prohibited images and 109 videos. PSR ¶¶ 12-13.

Mr. Bullock's prior conviction for possession of child pornography, originated in the Lowell District Court and occurred when he was 19 years old. PSR ¶ 46. He successfully completed a 3-year term of probation, including sex offender treatment.

In the present case, Mr. Bullock was released on conditions following a detention hearing. The court imposed a number of conditions including electronic monitoring and computer and internet restrictions. Mr. Bullock has remained out of custody throughout the pendency of this case, fully compliant with all conditions. This record of compliance provides support for continued rehabilitation following incarceration in this case. Mr. Bullock maintained his employment, despite the stress of the impending

charges, crucially allowing him to stay busy and productive.

**III. Advisory Guideline, Binding Plea Agreement**

The PSR calculates the advisory guideline range in this case as 120 months based on the statutory mandatory minimum and pursuant to USSG § 5G1.1(b). Absent that statutory requirement, his guideline range would be 78-97 months based on the routine enhancements for number of images, use of a computer, as well as the other specific offense characteristics, with a criminal history category I.

Due to the statutory requirements of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), the primary focus of sentencing is driven not by the advisory guideline but based on the nature of the conviction and based on Mr. Bullock's prior conviction (for which he received a non-jail sentence).

It is also worth noting that the routine § 2G2.2 enhancements that applied in this case resulted in a 7-level increase in the otherwise applicable guideline range. Here, absent the statutory requirements and absent these near ubiquitous enhancements for number of images and use of a computer (+7), the otherwise applicable guideline range would have been 37-46 months. Based on that information, there is no reason for this Court to impose any sentence in excess of the statutorily required 120 months.

**IV. 3553(a) factors**

The Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *See Rodriguez,* 527 F.3d at 228, citing *Kimbrough,* 562 U.S. at 101. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.* In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id.*

A 10-year sentence of imprisonment is unquestionably a serious and severe sentence. While this is Mr. Bullock's second offense of this kind, the consequences have strikingly escalated from probation to now a decade in federal prison. There is no doubt that this jail sentence will afford adequate deterrence – both to Mr. Bullock and more generally. This conviction has profoundly impacted his life in all aspects, and sends a strong message to the community. Further, this sentence addresses each of the required factors of deterrence, avoiding unwarranted sentencing disparities, and protection of the public.

Moreover, the proposed sentence will afford effective treatment as required by section 3553(a)(2)(D). Mr. Bullock will be able to participate in BOP treatment programs[1] including sex offender treatment and mental health treatment, and his continued participation will be mandated for the years that he will be monitored by federal probation while on supervised release. His treatment participation will further reduce his recidivism risk, most importantly through programming including cognitive behavioral therapy.[2] Mr. Bullock is committed to engaging in mental health and sex offender treatment, and when released from prison, he will continue this course of rehabilitation in the community. This path, which, along with family and friend support and his determination to find meaningful work again, will further reduce any hypothetical future recidivism risk.[3] The conditions of supervised release will afford structure

---

1 Because inmates ordinarily participate in the two relevant sex offender treatment programs during the last 36-48 months of their sentence, a sentence of longer than 10 years would only further remove Mr. Bullock from the treatment he needs. There is no reason to further postpone treatment any longer than it will already be delayed. This would be antithetical to rehabilitation in violation of 18 U.S.C. § 3553(a)(2)(D) and, almost standing alone, would make a sentence of greater than 10 years "greater than necessary" to accomplish the purposes of sentencing. See BOP, "*Sex Offenders*," https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp ("Offenders typically participate in sex offender treatment in the final three years of their incarceration"), and BOP Program Statement 5324.10, "Sex Offender Programs," https://www.bop.gov/policy/progstat/5324_010.pdf

2 U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006); *See* 2012 Report at 278 &n.31(stating that "appropriate 'treatment interventions'…are associated with very significant lower rates of recidivism").

3 *See* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004) (the Commission's research demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, as does substantial other research; *see* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf; Robert J.Sampson & John H. Laub, *Crime and Deviance Over Life Course: The Salience of Adult Social Bonds*, 55 Am. Soc. Rev. 609 (1990).

and accountability for Mr. Bullock as he navigates the return to community following incarceration. This requested sentence reflects the nature and circumstances of Mr. Bullock's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008). Mr. Bullock has the support of family and friends who understand fully the seriousness of his offenses, and who also understand that their loved one still has a future ahead of him. They want him to be safe, and to return to society and never return to a criminal courtroom again. His mother stands steadfastly behind him and will continue to support him throughout this sentence and in the period of supervised release to follow.

## V. CONCLUSION

For the foregoing reasons, the Court should impose 120 months followed by five years of supervised release, with conditions to include sex offender treatment, to assist him in rehabilitation. This requested sentence reflects the nature and circumstances of Mr. Bullock's offense and his history and characteristics, and is "sufficient, but not greater than necessary." For this defendant, a 10-year sentence followed by five years of supervised release with strict and specifically tailored release conditions achieves the 18 U.S.C. §3553(a)(2) sentencing goals.

Further, Mr. Bullock requests that this Honorable Court recommend to the Bureau of Prisons ("BOP") that he be designated to a facility, commensurate with this security level, in Massachusetts – specifically, FMC Devens, to permit him to engage in sex offender treatment[4] and to be closer to the only family he has and the only community he has ever known.

Respectfully submitted,

---

[4] *See* Federal Bureau of Prisons, Custody & Care: Sex Offenders, listing FMC Devens as one of the ten BOP facilities that offer sex offender treatment: https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp

*/s/ Cara McNamara*
Cara McNamara BBO
# 712096
Federal Defender Office
51 Sleeper St., 5th Floor
Boston, MA 02210
Tel:617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 19, 2026.

*/s/ Cara McNamara*
Cara McNamara